**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Crystal MASON, Edward Young,**
**Defendants–Appellants.**

**Nos. 88–5478, 88–5481.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 1, 1989.

Decided May 10, 1990.

Roger S. Hanson, Santa Ana, Cal., for defendants-appellants.

Thomas C. Stahl, Asst. U.S. Atty., San Diego, Cal., for plaintiff-appellee.

Before HUG, CANBY and BOOCHEVER, Circuit Judges.

HUG, Circuit Judge:

Edward Young and his wife Crystal Mason were charged as principals and aiders and abettors in four counts of bank fraud in violation of 18 U.S.C. §§ 1344(a)(2), 2 (1988) and also were charged with being principals and aiders and abettors in the use of interstate commerce in the aid of racketeering in violation of 18 U.S.C. §§ 1952(a)(3) and 2 (1988). They were convicted on all counts.

Young and Mason ran two escort services in Philadelphia that involved prostitution. The gravamen of these offenses is that charges on credit cards for services were fraudulently factored through a third-party out of state. This third-party imprinted a fictitious business name and deposited the credit card slips with a bank, concealing the fact that the slips were actually for an out-of-state escort business. The major issue raised in defense at trial was that Young and Mason contended that they were operating their business during the times in question under the authorization of an FBI agent who was using them as informants. The primary issue on appeal is whether the jury was appropriately instructed upon this theory of defense. We find that Young and Mason proposed an appropriate instruction and objected to the instruction given relative to that defense and that the instructions as a whole were deficient in this regard. We also find that the application of the bank fraud statute here did not violate the Ex Post Facto Clause and that there was sufficient evidence of specific intent under the bank fraud statute introduced at trial. As we affirm in part, reverse in part, and remand for a new trial, we need not discuss other issues raised by Young and Mason in this appeal.

## I.

### FACTS

This criminal action arose out of the ownership and involvement of Young and Mason in Tigress and Black Magic, two Philadelphia escort services, which actually involved prostitution. The escorts were provided with blank credit card sales slips and imprinting machines. The customers were informed that the business name on the statements would be "Pictures Are Forever" or that the business name would be discrete.

When escort services were transacted by credit card, the credit card slips were forwarded to Bruce Compton in California for

processing. The credit charges were listed under the company name "Pictures Are Forever," a purported photography business owned by Compton. Compton applied for and obtained a merchant account for "Pictures Are Forever" in San Diego, California, initially with Citizens Western Bank, in November 1982. In March of 1984, that bank closed the account because of the cost of handling the excessive number of customer disputes on the sales slips deposited with the account. Thereafter, on March 23, 1984 Compton applied for and obtained a merchant account with the Wells Fargo Bank in San Diego.

As a merchant account holder, Compton obtained immediate credit for the amount of deposited credit card sales drafts he received from Tigress and Black Magic. Compton would then compensate these escort services for the credit card amount less a fifteen percent service fee. Bank policy at both federally insured institutions prohibited third-party processing and did not provide merchant accounts to escort agencies, massage parlors and other like businesses. The reason, according to bank management testimony, was the higher incidence of charge-backs and fraud typically linked to such accounts and the fact that banks did not want to be associated with these enterprises. At the time of application, Compton did not disclose to the banks that he would process credit card sales slips for out-call prostitution agencies. A Wells Fargo Bank vice president testified at trial that the institution lost at least $1,480 on the Pictures Are Forever account.

The bank fraud charges in this case involve the credit card charge slips which were given for services rendered by escorts at Tigress and Black Magic in March and June of 1985. They were forwarded to Compton who in turn deposited them in his merchant bank account at Wells Fargo Bank. During this same period, four checks were issued to Young and Mason, which were drawn on Compton's Wells Fargo Bank account in San Diego and deposited in the joint account of Young and Mason

in Prudential Savings Association in Philadelphia, Pennsylvania. The forwarding of these checks forms the basis for the charges of the use of interstate commerce in the aid of racketeering.

In 1981, the Federal Bureau of Investigation, Philadelphia division, authorized Young to continue engaging in the prostitution business that he operated so that Young could act as an informant in an investigation concerning Philadelphia area organized crime.[1] In particular, the FBI as well as other federal and state agencies were investigating organized crime figure Joseph Altimari for extortion from Young and his business. Young was assigned the code name "The Preacher." FBI Special Agent Paul Allen became Young's primary contact. As part of the investigation, Young wore a wire communication and also allowed his telephone conversations to be taped in order to record his discussions with Altimari and his associates. Twenty-one conversations were recorded. The investigating agencies decided it would be best for the State of New Jersey to prosecute Altimari and others. Young testified before the state grand jury and ultimately at the state trial in February, 1984. As a result of Young's testimony and other evidence, Altimari and others were convicted and sentenced to prison.

The Government contended that this authorization and Young's paid informant status were effectively terminated by the Philadelphia division in early 1984, after the state trial in which Young testified and Altimari was convicted. However, agent Allen testified that "Mr. Young was never specifically told that his authorization for criminal activity ended." Instead, Allen stated that since the trial was concluded and Young had relocated "he was no longer considered an active [FBI] informant." After the state trial, Young was told to enter the witness protection program, but declined. Young and Mason left Philadelphia for Ft. Worth, Texas and subsequently Denver, Colorado. During this period they maintained occasional contact with Allen. Young would pass on criminal activity in-

---

1. Mason became involved with the business and    aware of the informant relationship in 1983.

formation he considered significant. In Ft. Worth and Denver, Young also made similar contacts with local FBI agents. Allen and Young were friendly and exchanged Christmas cards. In Allen's December 19, 1985 Christmas card, sent to Young's mother's home, and which was introduced at trial, he thanked Young for a gift he received.

Allen testified he had never heard of Compton until Young called him on August 8, 1985. On the next day, Allen relayed this information concerning Compton to the San Diego Police Department, which told Allen it had an investigative interest in the matter. Allen then asked Young and Mason to "try to discover as much information as they could" for Allen to pass it on to San Diego. Allen testified he served as the middleman of the information at this time in order to protect Young's identity. Allen told Young and Mason this information was needed to prosecute Compton. Young and Mason had about seven or eight telephone calls with Allen, which provided statements concerning Compton, who was later convicted. In late 1986, Young and Mason became part of the investigation. On August 11, 1987, Young and Mason were secretly indicted, but were not arrested until February, 1988.

## II.

### EX POST FACTO

■ Young and Mason first contend that the federal bank fraud statute, 18 U.S.C. § 1344(a)(2), as applied to them violates the Ex Post Facto Clause, U.S. Const. art. I, § 9, cl. 3. This argument presents an issue of first impression within our circuit. As we recently noted, "two critical elements must be present for a criminal or penal law to be *ex post facto:* [1] it must be retrospective, that is, it must apply to events occurring before its enactment, and [2] it must disadvantage the offender affected

by it." *Watson v. Estelle,* 886 F.2d 1093, 1094 (9th Cir.1989) (quoting *Weaver v. Graham,* 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981)). The parties contest the presence of the first element. A challenge under the Ex Post Facto Clause is reviewed *de novo. Wallace v. Christensen,* 802 F.2d 1539, 1552 (9th Cir.1986) (en banc) (citing *United States v. McConney,* 728 F.2d 1195, 1200–01 (9th Cir.), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984)).

The bank fraud statute became effective October 12, 1984. *See* Continuing Appropriations, 1985—Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, Title II, § 1108(a), 98 Stat. 2147 (codified at 18 U.S.C. § 1344 (Supp. V 1987)). Compton submitted his applications for merchant accounts to Citizen's Western Bank on November 8, 1982 and to Wells Fargo Bank on March 23, 1984. The Government alleged in the Superseding Indictment, Counts I–IV, and presented evidence at trial that Young and Mason executed the bank fraud scheme on March 14, 21, 29, and June 14, 1985.

The parties characterize the alleged bank fraud conduct subject to the statute differently. Young and Mason argue that the prohibited conduct occurred during the fraudulent bank *application,* which undisputably preceded the effective date of the statute. The Government contends that the conduct charged was the *execution* of the scheme by depositing the sales slips and receiving credit while concealing the true nature of the business enterprise.

In pertinent part, the bank fraud statute prohibits one who "knowingly executes, or attempts to execute, a scheme or artifice ... to obtain any of the moneys ... credits ... or other property owned by" a federally insured institution by making false pretenses.[2] The plain language of the statute states that each execution of the scheme constitutes a separate offense. *See United States v. Poliak,* 823 F.2d 371, 372 (9th

---

2.  Section 1344. Bank Fraud
    (a) Whoever knowingly executes, or attempts to execute, a scheme or artifice—
    . . . .
    (2) to obtain any of the moneys, funds, credits, assets, securities or other property

owned by or under the custody or control of a federally chartered or insured financial institution by means of false or fraudulent pretenses, representations, or promises, shall be fined not more than $10,000, or imprisoned not more than five years, or both.

Cir.1987), *cert. denied,* 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988).

Here, each of the alleged acts under the Superseding Indictment, which was adequately supported by evidence at trial, constitutes a separate execution of the bank fraud scheme. Since none of these acts applies to events occurring before the statute's enactment, we find no violation of the Ex Post Facto Clause.

## III.

### FBI AUTHORIZATION

The major theory of the defense was that the operation of their escort services, including the credit card aspect of those services, was authorized by the FBI. Thus, as agents of the federal government, seeking to assist in law enforcement, they did not have the requisite intent for conviction of the crimes charged. The Government admits that from June, 1981 to February, 1984 defendants were, in fact, acting as government operatives for the FBI. The Government does not acknowledge that any implied authorization recommenced from Allen's August, 1985 direction to Young and Mason to "discover" as much information as possible about Compton.

The Government contends, in any event, that at the time of the charges in question, in March and June of 1985, Young and Mason were not operating under the authorization of the FBI. This question of when this authorization terminated then became a vital fact issue for determination by the jury.

■ A defendant is entitled to have the judge instruct the jury on his theory of defense, provided that it is supported by law and has some foundation in the evidence. *United States v. Lopez,* 885 F.2d 1428, 1434 (9th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 748, 107 L.Ed.2d 765 (1990). A failure to give such instruction is reversible error; but it is not reversible error to reject a defendant's proposed instruction on his theory of the case if other instructions, in their entirety, adequately

cover that defense theory. *Id.* We review *de novo* the question of whether the district court's instructions adequately cover the defense theory. *Id.*

■ Young and Mason submitted the following proposed instruction on their theory of defense:

The defendants assert that they were a victim of governmental action or behavior as to all offenses charged in the indictment.

Where a person carries on criminal conduct at the request or behest or asking of the government by officers of the Federal Bureau of Investigation, the law as a matter of policy forbids his/her conviction in such a case.

If the evidence leaves you with a reasonable doubt as to the defendants' intents and purposes to commit the charges in this indictment, then it is your duty to find him or her not guilty.

The burden is on the government to prove beyond a reasonable doubt that the defendants were not induced by governmental behavior or acts to commit the charged offenses.

At the conference to settle instructions, the Government objected to the proffered instruction, contending it was an incorrect statement of law. The court disagreed with the Government, noting: "I think that the Government gives that imprimatur to a defendant to carry on a certain type of [authorized] activity. I don't think [the Government] can then prosecute them for it." After the Government's request to recess and study the issue was granted, the Government proposed in place of the requested instruction the Ninth Circuit Model Jury Instruction for entrapment. The defense objected, and the district court at that time agreed with defense counsel: "It's not a predisposition case; that's the trouble, but I am going to have to work on it some more." The court stated it would give its drafted instruction to the jury after closing arguments. Consequently, no counsel was aware what the instruction would be until it was actually given.[3]

---

**3.** No party argued, and we need not decide for purposes of this appeal, whether the trial court

committed prejudicial error by failing to comply with the requirement of Fed.R.Crim.P. 30

The instruction the court ultimately gave relative to this theory of the defense was the Government's proposed entrapment instruction, which was as follows:

The defendants have asserted that they were victims of entrapment. The government must, therefore, prove beyond a reasonable doubt, in addition to the elements of the offense itself, that the defendants were not entrapped. Where a person having no previous intention to violate the law is talked into committing a crime by government agents, he is entrapped, and the law as a matter of policy forbids his conviction. On the other hand, where a person is already willing to commit a crime, it is not entrapment if government agents merely provide an opportunity to commit the crime, so then if you find beyond a reasonable doubt that before anything was done by government agents, defendants were willing to commit a crime like the one charged in the Indictment if the opportunity was offered, and that the government agents did no more than offer that opportunity, then you should find that the defendants were not entrapped.

On the other hand, if the evidence in the case leaves you with a reasonable doubt whether the defendants were willing to commit the crime apart from the persuasion of government agents, then you must find them not guilty.

The defendants further objected to this instruction on the ground that it did not cover their defense theory and on the further ground that they had never asserted that they were victims of entrapment.

It is apparent that this entrapment instruction does not adequately express the defendants' theory of the case, as the district court initially recognized. This is not an entrapment situation in which a covert government agent engages in a criminal transaction with a defendant. There, the issue is whether the government agent improperly induced the defendant to commit criminal actions when that person was not otherwise predisposed to do so. In this case, there is no question that the defendants were operating a prostitution enterprise prior to any government involvement. It is clear that the FBI did authorize these defendants to continue operating the prostitution enterprise in order for federal and state authorities to develop a criminal case against an organized crime figure. When that authorization terminated was a contested factual issue. Part of that prostitution enterprise operated by Young and Mason was based upon the credit card business. There is no indication that the government authorization sought to limit this activity; in fact, Young and Mason were later used to gather evidence against Compton, which directly pertained to the credit card business. The evidence produced at trial was sufficient for a jury reasonably to find that the government authorization continued through the times of the misconduct alleged in the indictment.

The defendants objected to giving the entrapment instruction expressly for the reason that the predisposition element of the instruction was not pertinent to this case and would mislead the jury. As noted, the Government had argued that the standard entrapment instruction was the appropriate instruction to be given concerning this theory of defense. On appeal, the Government does not seriously contend that the entrapment instruction appropriately instructed the jury on the defendants' theory of the case. Instead, the Government contends that other instructions relating to the requirement of specific intent and wilfulness adequately cover the theory of the defense.

We have held that if a jury found that a defendant committed the acts in violation of criminal statutes while acting as an agent for the law enforcement authority, or even if he held a mistaken, but reason-

that the court "inform counsel of its proposed action [regarding requested jury instructions] *prior* to their arguments to the jury." (Emphasis added). *See, e.g., United States v. Gaskins,* 849 F.2d 454, 458 (9th Cir.1988) ("Failure to comply with Rule 30 is reversible error, however, 'only if counsel's closing argument was prejudicially affected thereby.'") (quoting *United States v. Harvill,* 501 F.2d 295, 296–97 (9th Cir.1974) (per curiam)).

able, belief that he was so acting, then the jury would have to exonerate him. *United States v. Lee,* 589 F.2d 980, 986 (9th Cir.), *cert. denied,* 444 U.S. 969, 100 S.Ct. 460, 62 L.Ed.2d 382 (1979). Similarly, in *United States v. Hughes,* 626 F.2d 619, 627 (9th Cir.), *cert. denied,* 449 U.S. 1065, 101 S.Ct. 793, 66 L.Ed.2d 611 (1980), we held that if the jury had believed that the Bureau of Land Management had authorized the defendant to sell horses for slaughter in violation of the Wild Free-roaming Horses and Burros Act, as contended by the defense, they could not have found the intent necessary to support the conviction. In *United States v. Ramirez,* 710 F.2d 535, 543–44 (9th Cir.1983), a similar situation was involved. The defendant contended that he was working as a police informer in committing the acts in question. We held that if a jury believed that he was so operating the jury could not have found the necessary intent to convict of the crime.

In each of the above three cases, the defendant had requested a more specific instruction on government authorization, similar to the one requested in this case. In each case, we held that other instructions adequately presented the theory of the defense.

■ That is the Government's contention in this case. We must therefore examine the other instructions that the Government contends adequately present the defense theory in this case. The district court gave the following general instructions on intent:

In every crime there must exist a union of act and intent. The burden is always upon the government to prove both act and intent beyond a reasonable doubt.

In this case specific intent must be proved. A person who knowingly does an act which the law forbids intending with bad purpose to disobey the law, may be found to act with specific intent.

While witnesses may see and hear and so be able to give direct evidence of what a defendant does, there can be no eyewitness account of the state of mind with which the acts were done, so intent may be proved by circumstantial evidence, and it rarely can be established by other means.

"Unlawfully" means "contrary to law", so to do an act unlawfully means to do wilfully something which is contrary to law. An act is done wilfully if done voluntarily and intentionally and with the intent to do something the law forbids. An act is done knowingly if done voluntarily and intentionally and not because of mistake or accident or other innocent reason.

These instructions were then immediately followed by the entrapment instruction.

The Government argues that the instructions defining "unlawfully" and "wilfully" appropriately instructed the jury on the theory of the defense. The difficulty with these instructions is the defendants acknowledge that, in running the prostitution business, they were knowingly doing something contrary to law and intentionally doing something the law forbids; but they contend this was authorized by the law enforcement agents of the federal government in order to use them as informants.

In fairness, these general instructions on intent do not meaningfully express to the jury the theory of the defense, particularly when considered with the misleading entrapment instruction that immediately followed these general instructions. The entrapment instruction purported to express the theory of the defendants but, as the court had earlier noted in conference, was inappropriate because it required a lack of predisposition. Furthermore, the entrapment instruction commenced, "[t]he defendants have asserted that they were victims of entrapment;" whereas, in fact, they had not made that assertion and had specifically objected to the instruction because it mischaracterized their defense.

The instruction offered by the defense did express the government authorization theory of defense. It is not a model that necessarily should be followed in other cases, but it was not an erroneous expression of the law, as the district court initially recognized.

A simple instruction, such as the following, would have sufficed:

If a person engages in conduct violative of a criminal statute at the request of a government law enforcement offi-

cer, with the reasonable belief that he or she is acting as an authorized government agent to assist in law enforcement activity, then that person may not be convicted of violating the criminal statute, because the requisite criminal intent is lacking.

Expressing the theory of the defense in an instruction that precisely defines that theory is far superior to reliance on the jury's ability to piece the theory together from various general instructions.

We do, however, look to the instructions as a whole and a refusal to give a proper specific instruction can be remedied by other instructions that cover the subject. However, in reviewing the instructions as a whole, we must consider how they will reasonably be understood by the jury in the context of the whole trial. *Stoker v. United States*, 587 F.2d 438, 440 (9th Cir.1978) (we determine "whether or not the instructions taken as a whole were misleading or represented a statement inadequate to guide the jury's deliberations"). In *United States v. Brooksby*, 668 F.2d 1102, 1105 (9th Cir.1982), we held that even though a correct exposition of the law could be pieced together from reading the indictment and the definition of "wilfulness," the defendant was prejudiced because a specific instruction left out the wilful element of the crime. In that case, the whole theory of the defense was whether the tax evasion was wilful. We held that even though a correct exposition of the law, including wilfulness, could be found in the general instructions, the instructions as a whole were deficient.

In the case at hand, the instructions as a whole in the context of this trial did not fairly convey to the jury the law on the theory of the defense, particularly in light of the misleading entrapment instruction.

## IV.

## SUFFICIENCY OF THE EVIDENCE FOR BANK FRAUD

■ Young and Mason appeal the sufficiency of the evidence for their bank fraud convictions. Although we would reverse the convictions based on the erroneous the-

ory of defense instructions, we are required to review the sufficiency of the evidence challenge. For if the evidence was insufficient, as Young and Mason contend, their retrial would be barred by the Double Jeopardy Clause. *See, e.g., United States v. DiCesare*, 765 F.2d 890, 900 (9th Cir.), *amended*, 777 F.2d 543 (9th Cir.1985). We review the sufficiency of the evidence in the light most favorable to the Government to determine if *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

■ Young and Mason argue that an element of the bank fraud statute is an intent to cause a loss to the bank. In relevant part, the bank fraud statute directly tracks or is parallel to the mail and wire fraud statutes. *Compare* 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud) (1982), *with* 18 U.S.C. § 1344 (Supp. V 1987) (bank fraud). The legislative history clearly establishes that the bank fraud statute was "modeled" on the mail and wire fraud statute. *See* S.Rep. No. 225, 98th Cong., 2nd Sess. 378 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3519; *see also United States v. Bonallo*, 858 F.2d 1427, 1432 (9th Cir.1988) (noting this legislative history in construing section 1344(a)(1)). Moreover, the legislative history expresses the congressional intent that the bank fraud statute receive the same broad scope as the mail and wire fraud statutes. S.Rep. No. 225, 98th Cong., 2nd Sess. 377–78 (1983), 1984 U.S.Code Cong. & Admin.News 3517, 3519; *Bonallo*, 858 F.2d at 1432 & n. 6 (quoting H.R.Rep. No. 901, 98th Cong., 2d Sess. 4 (1984)). In enacting the bank fraud statute, Congress also took into account the body of case law accompanying the mail and wire fraud statutes. *See, e.g., Bonallo*, 858 F.2d at 1432–33.

First, we observe that it is not entirely clear whether an ascertainable loss resulted from Young and Mason's involvement in the scheme.[4] In particular, Young and Ma-

---

4. The period charged in the Superseding Indictment and supported by evidence at trial solely

concerned the Wells Fargo Bank merchant ac-

son argue that as long as the prostitution customer pays his credit bill, the bank suffers no loss. Further, if a charge back resulted, they argue the bank would charge Compton as the merchant account holder. We need not reconcile this factual issue because we nonetheless find this argument unavailing.

The language of section 1344(a)(2) broadly applies to "a scheme ... to obtain *any* of the *moneys,* funds, *credits,* assets, securities or other property *owned* by or under the *custody* or *control* of a federally chartered or insured financial institution." (Emphasis added). In addition to this expansive language, as already noted, the legislative history supports a broad construction of the statutory language. The bank fraud statute was enacted as a result of "various gaps in existing statutes, as well as the lack of a unitary provision aimed directly at the problem of bank fraud." S.Rep. No. 225, 98th Cong., 2nd Sess. 378 (1983), 1984 U.S.Code Cong. & Admin.News 3518. Congress wanted "to provide an effective vehicle for the prosecution of frauds in which the victims are financial institutions that are federally created, controlled or insured." *Id.* at 377, 1984 U.S.Code Cong. & Admin.News 3517.

Against this background, we conclude a federally supported financial institution need not incur a "loss" in order to be a victim of "false or fraudulent pretenses,

representations, or promises." Such a narrow construction would only permit the punishment of the "loss" rather than the conduct that led or *could* lead to a loss. For example, some financial institutions, as a matter of policy, may not normally lend credit to enterprises engaged in prostitution because of a greater credit risk or for other legitimate reasons. A business applicant who misrepresents the true nature of the business would secure credit solely on the basis of the false statements.[5]

Young and Mason's contention that the bank fraud provision requires proof of an intent to cause a bank loss essentially involves the specific intent element of the bank fraud statute. *See United States v. Cloud,* 872 F.2d 846, 852 n. 6 (9th Cir.) (noting an essential element under section 1344 is a specific intent to commit bank fraud), *cert. denied,* —— U.S. ——, 110 S.Ct. 561, 107 L.Ed.2d 556 (1989).[6] *Compare Schreiber Distrib. Co. v. Serv–Well Furniture Co.,* 806 F.2d 1393, 1399–1400 (9th Cir.1986) (noting both mail and wire fraud statutes require specific intent).

Specific intent is established by "the existence of a scheme which was 'reasonably calculated to deceive persons of ordinary prudence and comprehension,' and this intention is shown by examining the scheme itself." *United States v. Green,* 745 F.2d 1205, 1207 (9th Cir.1984) (quoting *United States v. Bohonus,* 628 F.2d 1167, 1172 (9th Cir.), *cert. denied,* 447 U.S. 928, 100

---

count, not the Citizens Western Bank account. As already noted, testimony from a Wells Fargo Bank representative indicated a loss of at least $1,480 on Compton's merchant account. It is not clear whether any of the incurred loss was attributable to Young and Mason's involvement with the merchant account.

**5.** In *United States v. Swearingen,* 858 F.2d 1555 (11th Cir.1988) (per curiam), *cert. denied,* —— U.S. ——, 109 S.Ct. 1540, 103 L.Ed.2d 844 (1989), the Eleventh Circuit confronted an analogous argument. That case involved a scheme between two automobile dealers who fabricated illegitimate automobile sales in order to obtain interest-free loans. The bank would give the dealers immediate credit by increasing the checking account balance in the amount of the fictitious sale. The appellant argued that the two automobile dealers "were actually selling each other automobile titles ... and thus could not have intended to defraud the Bank." *Id.* at 1556. The Eleventh Circuit, in adopting

the reasoning of the district court, noted that the central "question is whether the false representations were capable of *influencing* the Bank's actions." *Id.* at 1558 (emphasis added). *Accord United States v. Goldblatt,* 813 F.2d 619, 624 (3d Cir.1987) (noting "[t]he Government was not required to show that [the bank] incurred a loss in order to prove a scheme to defraud") (cited in *Bonallo,* 858 F.2d at 1433 n. 7).

**6.** Other cases construing the bank fraud statute have noted that section 1344 requires specific intent. *See United States v. Gunter,* 876 F.2d 1113, 1120 (5th Cir.) (adequate jury instruction covering specific intent under section 1344 where the charge included the "intent to defraud" which was defined, *inter alia,* as "the specific intent to deceive"), *cert. denied* —— U.S. ——, 110 S.Ct. 198, 107 L.Ed.2d 152 (1989); *United States v. Harrod,* 856 F.2d 996, 1001 (7th Cir.1988) (noting, in considering the application of Fed.R.Evid. 404(b), that "specific intent is an

S.Ct. 3026, 65 L.Ed.2d 1122 (1980)), *cert. denied,* 474 U.S. 925, 106 S.Ct. 259, 88 L.Ed.2d 266 (1985). Intent to defraud may be established by circumstantial evidence. *See, e.g., Cloud,* 872 F.2d at 852 n. 6. As already noted, the trial court's instructions included a specific intent charge.

Regardless of whether any quantifiable dollar loss actually resulted, there was more than ample evidence submitted on which the jury could find that Young and Mason's role in the scheme *influenced* Wells Fargo Bank into continuing to provide Compton immediate credit on his merchant account. *See Swearingen,* 858 F.2d at 1558 ("The question is whether the false representations were capable of influencing the Bank's actions."). The evidence clearly showed that Wells Fargo Bank would not have opened a merchant account for Compton had it known that he would process third-party credit card slips or was laundering credit charges for prostitution. On the basis of the misrepresentations made on the true nature of the Pictures Are Forever business, the bank provided immediate credit to Compton for the deposited Tigress and Black Magic credit card slips for which prostitution was transacted. Based on this immediate credit, promptly after depositing these credit card slips, Compton issued reimbursement checks (less a service charge) on his merchant account which were deposited by Young and Mason.

By utilizing this immediate credit, Young and Mason were also able to mask the true prostitution activities for which the credit charges were made. At least two patrons testified that Tigress and Black Magic employees informed them the credit card charge for the "escort" service would be listed under the name Pictures Are Forever. A third testified that the charge would be discreetly billed. Prior to processing the charge, and before services were rendered, Tigress and Black Magic employees verified the credit card number and obtained an authorization number for the transaction amount. Blank credit card slips and imprinting machines were supplied by Compton for a fee. Blank credit card slips were deliberately utilized so Compton could imprint the Pictures Are Forever name and number before depositing the slips. Clearly absent this third-party processing through Compton, Young and Mason would not have been able to open a similar merchant account for depositing such credit card slips under the policy of Wells Fargo Bank or Citizens Western Bank.

We find there was sufficient evidence to support the specific intent element based upon this participation in the bank fraud scheme. Young and Mason do not dispute, and we therefore do not consider, the remaining elements for section 1344(a)(2) bank fraud.

AFFIRMED IN PART, REVERSED IN PART and REMANDED.

---

essential element of ... bank fraud under § 1344(a)"); *accord Swearingen,* 858 F.2d at 1557 (finding specific intent to defraud under section 1344 in a scheme involving illegitimate automobile sales).

