86 F.3d 1164
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Carey Edward ELLIS, Defendant-Appellant.
 No. 95-10064.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 8, 1996.
Decided May 28, 1996.
 
 1
 Before: BROWNING and JOHN T. NOONAN, JR., Circuit Judges, and MERHIGE, Senior District Judge.*
 
 
 2
 MEMORANDUM**
 
 
 3
 Carey Edward Ellis was convicted of possession of a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and unlawful use or carrying of a firearm during a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). He appeals the district court's denial of his motion to suppress statements made by him, overruling his objection to reopening of evidence, denial of his request for an entrapment instruction, and denial of his motion for acquittal.
 
 I.
 
 4
 On February 9, 1994 a federal grand jury sitting in Las Vegas returned a two-count indictment against Ellis charging him with possession of a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and unlawful use or carrying of a firearm during a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). Ellis had previously been arrested on January 23, 1994 in Las Vegas. Ellis was tried by a jury on November 8 and 9, 1994 and was convicted on both counts of the indictment. On January 29, 1995 the district court sentenced Ellis to consecutive sentences of 120 and 60 months, 5 years supervised release, and a fine of $2500. On January 18, 1994, Las Vegas Metropolitan Police Department Detective Joe Lombardo, working with a confidential informant, arranged a narcotics transaction with the defendant, Cary Edward Ellis. The informant, Toby Potter, was cooperating with the police under an agreement entered into as a result of Potter having been charged with various drug trafficking and firearms offenses. The drug transaction was arranged when the informant telephoned Ellis from a bar and upon Ellis' arrival introduced him to Lombardo. At this time, Ellis provided approximately one-half ounce of methamphetamine to Lombardo in exchange for $450.
 
 
 5
 Lombardo set up a second drug transaction by calling Ellis directly. The two met on January 19, 1994, when Ellis again provided Lombardo with approximately one-half ounce of methamphetamine in exchange for $450. On the occasion of the January 19, 1994 transaction, Lombardo asked Ellis if he could purchase from him a quarter-pound of methamphetamine in the future. Ellis responded affirmatively and stated that the price would be $3,000.
 
 
 6
 On January 23, 1994, at approximately 5:00 p.m., Lombardo placed a telephone call to Ellis and they discussed the purchase of a quarter-pound of methamphetamine in exchange for $3,000. After receiving a page from Ellis about an hour later, Lombardo called Ellis and the detective was told that Ellis had the quarter-pound of methamphetamine in his possession and was ready to do the transaction. It was agreed to do the deal at a restaurant parking lot.
 
 
 7
 Surveillance was established at the restaurant parking lot prior to the transaction, as it had been at the site of each of the prior transactions. Ellis subsequently arrived at the parking lot by automobile. Lombardo then arrived by automobile and parked on the passenger side of Ellis's vehicle. Ellis told Lombardo that he needed to park along Ellis' driver's side in order to complete the deal. After parking his car alongside Ellis' driver's side, Ellis told Lombardo that the methamphetamine was located in a McDonald's cup on the ground on the passenger side of Lombardo's vehicle. Lombardo then opened the cup lid and observed approximately 4 ounces of a substance he believed to be methamphetamine. Lombardo then took the cup, placed it in his undercover vehicle, and asked Ellis how much money he was owed. Ellis told Lombardo $3,000, pursuant to their agreement. Lombardo then asked Ellis why he had placed the cup on the ground. Ellis responded that he was in fear that there was police presence in the parking lot and that he did not want to get caught with the methamphetamine in his possession. Lombardo then gave Ellis $3,000 and counted it in Ellis' presence. At the same time, Lombardo gave the pre-arranged arrest signal and Ellis was arrested and thereafter read his Miranda warnings.
 
 
 8
 At the time of Ellis' arrest there were four or five police cars, six officers, and an FBI agent at the scene. At some point in time, all six officers approached Ellis with guns drawn and yelling at Ellis to exit his vehicle and place his hands in plain view.
 
 
 9
 Ellis advised the officers that there was a gun in the car. Ellis stated that he had it for protection as he had been robbed twice in the past. He also told the officers that there was more methamphetamine in the cellular phone located in his vehicle. A search of the phone uncovered the additional methamphetamine and a loaded firearm was found on the floorboard of Ellis' car at the foot of the driver's seat.
 
 
 10
 One of the officers told Ellis that he was facing twenty-five years to life in prison. Detective Young, who was aware that Ellis had previously had contact with the law, offered Ellis the opportunity to "help himself" out by cooperating with the police. Ellis and the law enforcement officers discussed cooperation whereby Ellis would arrange another drug transaction with a third party. The police told Ellis that they would arrest the third party and take Ellis and the third party to jail, but then let Ellis go home that evening. This cooperation did not take place because Ellis was unable to arrange another drug transaction unless the police would provide him with cash. The police were unable to do this.
 
 II.
 
 11
 A. Motion to Suppress Incriminating Statements as Involuntary
 
 
 12
 This Court reviews de novo the voluntariness of a confession. United States v. Benitez, 34 F.3d 1489, 1495 (9th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1268 (1995); United States v. Bautista-Avila, 6 F.3d 1360, 1364 (9th Cir.1993). A district court's factual findings underlying its voluntariness determination are reviewed for clear error. Id.
 
 
 13
 "Before a criminal defendant's statement can be used against him, the government must prove its voluntariness by a preponderance of the evidence." United States v. Leon Guerrero, 847 F.2d 1363, 1365 (9th Cir.1988). Determination of whether a statement is involuntary requires "a careful evaluation of all the circumstances of the interrogation." See Mincey v. Arizona, 437 U.S. 385, 401 (1978). "The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." Guerrero, 847 F.2d at 1366.
 
 
 14
 Ellis asserts that the circumstances in which his statements to police immediately following his arrest were elicited reveal the involuntary nature of those statements. He notes that he had just been surrounded by four or five police cars and at least seven screaming law enforcement officers, six of whom had their guns drawn, at the time of his arrest. Appellant also notes that law enforcement officers told him that he was facing 25 years to life in prison and promised him that if he cooperated that he could go home that night. Appellant asserts that these representations by the police amounted to an implication that things would go harder on him if he did not cooperate. Appellant correctly cites United States v. Harrison for the proposition that "there are no circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor. 34 F.3d 886, 891-892 (9th Cir.1994) (emphasis in original).
 
 
 15
 In this case the Appellant does not assert that law enforcement officers explicitly threatened harsh treatment as a result of his silence. Nor does he challenge the government's assertion that law enforcement officers routinely promise narcotics arrestees some form of favorable treatment if they cooperate by arranging further drug transactions. Neither does he claim that the offer of favorable treatment in exchange for his cooperation was made in bad faith. Rather, the Appellant argues that the request for his cooperation, when coupled with the statement by a law enforcement officer that he was facing 25 years to life in prison, amounted to an implicit threat that rendered his statements involuntary--especially in light of the number of law enforcement vehicles and armed officers in such close proximity to him.
 
 
 16
 The Court does not agree that these factors rendered Ellis' statements to police involuntary. The magistrate found Ellis, who was 21 years of age, "to be a reasonably intelligent and savvy young man." Furthermore, Ellis admitted during the suppression hearing held by the magistrate judge that he had been arrested on four to five prior occasions as an adult. Also during that hearing Ellis revealed that discussion of cooperation did not come immediately on the heels of his arrest by the armed, screaming officers and that he asked the law enforcement official "more than once" to explain how any cooperation would work before agreeing to try to cooperate.[1]
 
 
 17
 The Court concludes that the mere coupling of a statement by law enforcement officers as to the penalty a suspect is facing with an offer to allow the suspect to cooperate does not alone yield an impermissible threat that prosecutors and judges will impose harsher treatment on a suspect for the exercise of the right to silence. The Court is satisfied, given the evidence of Ellis' reasoned reflection of the pros and cons of cooperation, that the circumstances of Ellis' arrest did not combine to render his statements involuntary.
 
 
 18
 B. Reopening Presentation of Evidence by United States
 
 
 19
 The decision of the district court to allow a party to reopen its case is reviewed for an abuse of discretion. United States v. Huber, 772 F.2d 585, 592 (9th Cir.1985).
 
 
 20
 The Appellant contends that he was prejudiced when the trial court, in response to a written question received from a juror after the government had just finished presenting its case-in-chief on the afternoon of November 8, 1994, allowed the government, in response to the juror's question, to present testimony concerning whether the gun found in the Appellant's car was loaded. The trial court did not allow additional testimony on three other issues raised by the jurors note on the grounds that such testimony was either cumulative or irrelevant. The evidence concerning whether the gun was loaded was presented although the government had rested its case the preceding afternoon. While there is some dispute as to whether this had formally been done; the defense had chosen not to present any evidence, so unquestionably both sides had rested. It is noteworthy that the evidence complained of was presented prior to closing arguments. The trial transcript reveals that the district court made the following explanation to the jury as to what was occurring:
 
 
 21
 THE COURT: Ladies and gentlemen, let me explain how we're going to proceed....
 
 
 22
 The Government had finished its presentation of evidence yesterday; the defense had indicated it would not call any evidence. We did however have a note from a juror, and that prompts us to allow Mr. Cook to reopen briefly for just one question to one of the witnesses, Mr. Young, who had previously been sworn to testify.
 
 
 23
 So Mr. Young, if you'd come back up to the witness stand. I remind you, sir, you're still under oath. And Mr. Cook has just a brief question for you.
 
 
 24
 At that point the prosecutor asked the witness if the gun found in Ellis' car had been loaded and the witness responded that it had. Defense counsel had no questions on cross-examination.
 
 
 25
 The Court concludes that the district court did not abuse its discretion in allowing the presentation of this evidence after the prior closing of the government's case. The trial court specifically stated that it considered that the evidence was relevant in that it could be "a circumstance indicative of [the gun's] use, or potential for use" in relation to the firearms charge. In addition, the district court's colloquy with counsel and the fact that the district court rejected further evidence as to other issues evidences the district court's consideration of the factors of relevance and cumulative testimony, as well as its concern that the evidence not be given undue weight by the jury because of the unusual timing of its presentation. Furthermore, the district court's explanation did not place any special import on the testimony. Finally, the defense was given the opportunity to cross-examine the brief testimony and had on the preceding day been made aware that the testimony would be presented. See United States v. McQuisten, 795 F.2d 858, 863-864 (9th Cir.1986) (commenting on defense's failure to seek cross-examination in holding that district court did not abuse its discretion in allowing prosecution to reopen its case after the close of evidence).
 
 C. Entrapment Instruction
 
 26
 The standard of review of a district court's denial of a defendant's proposed jury instruction is dependent on the nature of the error alleged. United States v. Duran, 59 F.3d 938, 940 (9th Cir.1995). "In general, a defendant is entitled to have the judge instruct the jury on his theory of defense, provided that it is supported by law and has some foundation in the evidence. If the parties dispute whether the required factual foundation exists, the court should apply an abuse of discretion standard of review." Id. at 941 (quoting United States v. Mason, 902 F.2d 1434, 1438 (9th Cir.1990). Alternatively, where the issue is whether "other instructions, in their entirety, adequately cover that defense theory," the appropriate standard of review is de novo. Id. In this case the Appellant challenges the district court's conclusion that there was no factual foundation in the evidence to justify an instruction to the jury on entrapment. The standard of review on this issue is abuse of discretion.
 
 
 27
 A criminal defendant is entitled to a jury instruction "on any defense which provides a legal defense to the charge against him and which has some foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility." United States v. Sotelo-Murillo, 887 F.2d 176, 178 (9th Cir.1989). The defense of entrapment has two elements: (1) government inducement of the crime, and (2) the absence of predisposition on the part of the defendant. United States v. Skarie, 971 F.2d 317, 320 (9th Cir.1992). A defendant must present some evidence of both elements before a trial court may instruct the jury on an entrapment theory. United States v. Busby, 780 F.2d 804, 806 (9th Cir.1986).
 
 
 28
 The evidence in this case reflects that a police informant, who was in serious legal trouble, telephoned Ellis, who had not been the subject of any police investigation to that point, and said something to Ellis which induced him to come to a bar to meet Detective Lombardo, unknown to Ellis as an undercover law enforcement officer. The Appellant argues, as he did at trial, that this evidence is sufficient to support the inference that the police informant did something which constituted inducement. The district court rejected this reasoning at trial and stated:
 
 
 29
 Well, counsel, there's just not even slight evidence in my view of entrapment here. There is evidence certainly that Mr. Potter [the confidential informant] made a deal when he was facing charges. And as to his conduct thereafter vis-a-vis Mr. Ellis, other than dropping a dime, putting him in contact with the undercover agent, Mr. Lombardo, there's really no evidence at all that would suggest any kind of inducement or coercion on the part of either Mr. Potter, or for that matter Mr. Lombardo. The subsequent events I think reinforce that, the circumstances on the 19th and the 23rd of January.
 
 
 30
 The Court concludes that the district court's holding that there was no factual foundation for a charge of entrapment was not an abuse of discretion.
 
 
 31
 D. Sufficiency of Evidence to Prove Violation of 18 U.S.C. § 924(c)(1)
 
 
 32
 There is sufficient evidence to support a conviction if, reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). When sufficiency of the evidence is properly preserved by making a motion for an acquittal after the close of all evidence, as it was in this case, this court's standard of review is the same as review of the district court's denial of that motion. United States v. Riggins, 40 F.3d 1055, 1057 (9th Cir.1994). Thus, review is de novo. Id.
 
 
 33
 The evidence in this case is that a loaded pistol was found on the floorboard under the driver's seat of the car which Ellis was driving when he was arrested. There was also evidence that Ellis stated to police at the time of his arrest that he had the gun for protection because he had been robbed twice in the past on dope deals.
 
 
 34
 18 U.S.C. § 924(c)(1) reads "[w]hoever, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, shall ... be sentenced to imprisonment for five years ..." Therefore, under § 924(c)(1), the United States must prove that a defendant: (1) used or carried a firearm; (2) during and in relation to a drug trafficking crime.
 
 
 35
 The Court concludes that the issue of whether the evidence is sufficient to constitute "use" "in relation to" a drug trafficking offense within the meaning of 18 U.S.C. § 924(c)(1) has been dispositively resolved by the recent Supreme Court decision in Bailey v. United States, --- U.S. ----, 116 S.Ct. 501 (1995). In Bailey the Court held that in order to establish "use," "the language, context, and history of § 924(c)(1) indicate that the Government must show active employment of the firearm." --- U.S. at ----, 116 S.Ct. at 506. The Court went on to note that "active employment" included brandishing, displaying, bartering, striking with, and firing. --- U.S. at ----, 116 S.Ct. at 508. The Court also noted that even an offender's reference to a firearm in his possession could satisfy § 924(c)(1)." Id. The Court specifically rejected, however, the theory that § 924(c)(1) reached the situation where the offender "conceals a gun nearby to be at the ready for an imminent confrontation." Id. The Court specifically rejected, however, the theory that § 924(c)(1) reached the situation where the offender "conceals a gun nearby to be at the ready for stated that "[i]f the gun is not disclosed or mentioned by the offender, it is not actively employed, and it is not 'used'." Id.
 
 
 36
 The Court's inquiry is not yet at an end. The Court must determine whether Ellis could properly be convicted of this offense on the basis that he "carried" the gun in violation of § 924(c)(1). The Supreme Court in Bailey noted that the "carry" prong of § 924(c)(1) "brings some offenders who would not satisfy the 'use' prong within the reach of the statute." --- U.S. at ----, 116 S.Ct. at 509.
 
 
 37
 Prompted by the Supreme Court's decision in Bailey, in United States v. Hernandez this Court interpreted the "carry" prong of § 924(c)(1) and held that the defendant had not "carried" a firearm which had been in a locked toolbox in a garage. --- F.3d ----, 1996 WL 34822 (9th Cir.1996). We stated that "in order for a defendant to be convicted of 'carrying' a gun in violation of § 924(c)(1), the defendant must have transported the firearm on or about his person." Id. "This means," we elaborated, "the firearm must have been immediately available for use by the defendant." Id. (Citing United States v. Riascos-Suarez, 73 F.3d 616 (6th Cir.1996)).
 
 
 38
 While this Court has not yet addressed this specific question, the Court notes that the other circuits that have addressed the issue have determined that a drug dealer who places a gun within easy reach in the passenger compartment of a car and brings the gun with him in relation to a drug trafficking offense has "carried" the gun in violation of § 924(c)(1). See United States v. Riascos-Suarez, 73 F.3d 616 (6th Cir.1996) (holding that defendant could be convicted of "carrying" firearm in violation of § 924(c)(1) where a loaded weapon was found near driver's seat in car driven by defendant containing large amounts of cash and bags with cocaine residue); United States v. Freisinger, 937 F.2d 383 (8th Cir.1991) (defendant "carried" firearms when found with four guns in passenger compartment of car); see also United States v. Dorsett, 1996 WL 56450 (E.D.La.1996) (defendant "carrying" firearm where gun found "either under him or located under the arrest next to him" in car).
 
 
 39
 The Court concludes that a defendant may be convicted of carrying a firearm in violation of § 924(c)(1) where he transports the firearm within easy reach in the passenger compartment of a car. Such conduct amounts to "transport[ing] the firearm on or about [the] person" within the meaning of Hernandez.
 
 
 40
 In the instant case the firearm was located on the floorboard of the automobile driven by Ellis, directly beneath the driver's bucket seat. The evidence at trial indicated that the firearm was within arm's reach of Ellis. Therefore, the evidence in this case is sufficient to support a conviction on the basis that Ellis "carried" a firearm in violation of § 924(c)(1).
 
 III.
 
 41
 The Court AFFIRMS both Ellis' conviction for possession of a controlled substance with intent to distribute and his conviction for unlawful use or carrying of a firearm during a drug trafficking crime.
 
 
 
 *
 The Honorable Robert R. Merhige, Jr., Senior United States District Judge for the Eastern District of Virginia, sitting by designation
 
 
 **
 This disposition is not suitable for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 During the suppression hearing the following colloquy took place between Ellis and the prosecutor:
 Q: Okay. And the officer--Officer Young did--he's the one who read you your rights on this occasion, correct?
 A: Actually I don't remember, to tell you the truth.
 Q: Okay, but it could have been?
 A: Yes.
 Q: Okay. And you understood what he was saying, correct?
 A: Yes.
 Q: Okay. And you waived your rights and agreed to talk, correct?
 A: No, not--at first I didn't say anything. I just--I was just like, whatever. I just--they didn't ask me anything pretty much when they first arrested me. They just--they were just really quiet talking--they were talking amongst themselves.
 Q: Mm-hmm. But eventually you gave some--you made some statements about your involvement in this particular case, correct?
 A: Yes.
 Q: Okay. And then eventually you came to talk about possible cooperating, correct?
 A: He--when he--after he had brung it up and he explained to me how--how they would--how they would go about doing it, and I asked him more than once, actually, to explain to me how it was going to happen, and--
 Q: The cooperation?
 A: Yes.
 Q: Okay.
 A: And my--and the way I would--I would be able to go home.