**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Carlos Antonio GOMEZ–OSORIO,
Defendant–Appellant.**

No. 89–50280.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 7, 1992.

Decided Feb. 18, 1992.

Joseph F. Walsh, Los Angeles, Cal., for defendant-appellant.

Thomas A. Hagemann and Jeffrey C. Eglash, Asst. U.S. Attys., Los Angeles, Cal., for plaintiff-appellee.

Before FARRIS, NOONAN and TROTT, Circuit Judges.

FARRIS, Circuit Judge:

Carlos Gomez–Osorio appeals his conviction and sentence of twenty-seven months imprisonment (following a jury trial) for failing to report attempts to mail more than $10,000 out of the United States, in violation of 31 U.S.C. § 5316(a)(1)(A) (1988), and structuring monetary transactions, in violation of 31 U.S.C. § 5324(3) (1988). Gomez–Osorio argues that there was insufficient evidence to support his convictions and that the district court erred in: (1) admitting expert testimony regarding money laundering and Gomez–Osorio's criminal intent; (2) refusing to instruct the jury on Gomez–Osorio's defense theory; (3) denying Gomez–Osorio's motion to suppress evidence obtained without a search warrant; and (4) increasing Gomez–Osorio's base offense level under United States Sentencing Commission, *Guidelines Manual*, § 2S1.3(b)(1). We affirm.

### FACTS

On October 13, 1987, the U.S. Customs Service and the Culver City Police Department entered into an agreement that provided for Culver City police officers to assist in Customs' Outbound Currency Program. The agreement provided that the Culver City police officers "will be under the direct supervision of the Senior Customs Agent on the scene, whenever participating in Customs searches, seizures, and arrests."

On August 16, 1988, Customs Agent Czyrklis and Culver City Police Officer Ariza were working together at the Los Angeles International Airport. Their task was to examine packages that were leaving the United States by Federal Express. Ariza brought Gomez–Osorio's package to Czyrklis' attention because it was addressed to Colombia, the form of payment was cash, and $60 seemed a high price to ship what purportedly were "business magazines."

Czyrklis directed Ariza to open the package. Inside, Ariza found three magazines. Sixteen blank money orders totaling $14,500 and two cashier's checks totaling $2000 were glued to the pages of one magazine. The blank money orders were in $500 and $1000 amounts and had been purchased from fourteen financial institutions between August 12 and 14, 1987. The sender listed on the package was "Carlos Gomez." Czyrklis ascertained that Gomez–Osorio had not filed a Report of International Transportation of Currency or Monetary Instruments.

Based on this search, Czyrklis directed Federal Express to notify Customs of any packages sent to Colombia. Customs located two additional packages sent by Gomez–Osorio. The first package contained

checks and money orders totaling $16,000. No charges were brought against Gomez–Osorio based on this package because instruments totaling $8000 were made out to payees and thus instruments totaling less than $10,000 were subject to applicable reporting requirements.

The second package contained seventeen blank money orders totaling $16,000. The money orders in $500 and $1000 amounts were concealed in magazines and had been purchased from several financial institutions. The instruments had been purchased between August 16 and 18, 1987, and, as with the first package, no transaction at a single financial institution exceeded $10,000 on any one day. Gomez–Osorio again had not filed a transportation report.

Police officers located Gomez–Osorio at the address listed on the first of the three packages and observed him between August 22 and 25, 1988. Gomez–Osorio met other individuals and walked with them to nearby banks. He also used pay phones to place a series of calls to pagers. He received a number of return calls at these telephones.

On August 26, 1988, Czyrklis arrested Gomez–Osorio. Customs agents conducted a search of Gomez–Osorio's hotel room and found receipts for the money orders and cashier's checks, Gomez–Osorio's Colombian passport, which indicated that he had made several trips to the United States, cash receipts for hotel and airline expenses, blank Federal Express waybills, manila envelopes, carbon paper, a counterfeit currency detector, glue and tape, and a ledger in Gomez–Osorio's handwriting.

## DISCUSSION

1. *Sufficiency of the evidence*

   a. *"Structuring"*

   ▮ Gomez–Osorio argues that, at the time he committed the acts for which he

was convicted, section 5324(3) required multiple transactions exceeding $10,000 in a single day at a single financial institution. The district court instructed the jury that "[i]t is not necessary for the prosecution to prove that the defendant conducted a currency transaction through one bank on one day in excess of $10,000." The interpretation of statutes and applicable regulations raises a question of law that we review *de novo*. *See United States v. Varbel*, 780 F.2d 758, 761 (9th Cir.1986).

Statutory interpretation begins with the plain meaning of the statute. *See id.* Section 5324 provides:

> No person shall for the purpose of evading the reporting requirements of section 5313(a) with respect to such transaction:
>
> (1) cause or attempt to cause a domestic financial institution to fail to file a report required under section 5313(a);
>
> . . . .
>
> (3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.

Banks are required by 31 U.S.C. § 5313(a) to file a Currency Transaction Report for transactions involving more than $10,000. *See* 31 C.F.R. § 103.22(a)(1).[1]

Gomez–Osorio's reliance on 31 C.F.R. § 103.22(a)(1) is misplaced. The regulation applies only to banks. In other words, *a bank* must file a transaction report if the bank is aware that a customer's transactions at that and other banks totals more than $10,000 in one day. Section 5324 *builds* on this framework. Section 5324(1) makes it illegal to cause a bank to fail to file a transaction report as required by section 5313(a). Section 5324(3) *additionally* makes it illegal to structure monetary transactions with one or more financial institutions for the purpose of evading the reporting requirements of section 5313(a). Section 5324(3) requires only the *purpose*, *i.e.*, intent, to evade the reporting require-

---

1. 31 C.F.R. § 103.22(a)(1) (1991) provides:
   Each financial institution ... shall file a report of each ... exchange of currency or other payment ... which involves a transaction in currency of more than $10,000. Multiple currency transactions shall be treated as a single transaction if the financial institution has knowledge that they are by or on behalf of any person and result in either cash in or cash out totalling more than $10,000 during any one business day.

ments of section 5313. If a bank's obligation to file a transaction report was a precondition to a section 5324(3) conviction, section 5324(3) would be unnecessary because section 5324(1) would cover all possible offenses.

The plain meaning of section 5324(3) is supported by legislative history, current treasury regulations, and general policy considerations. The legislative history indicates that:

> [A] person who converts $18,000 in currency to cashier's checks by purchasing two $9,000 cashier's checks at two different banks or on two different days with the specific intent that the participating bank or banks not be required to file [transaction reports] for those transactions [would be guilty of an offense.]

S.Rep. No. 433, 99th Cong., 2d. Sess. 22 (1986). And, 31 C.F.R. 103.11(p) (1991) now expressly provides that the "transactions need not exceed the $10,000 reporting threshold at any single financial institution on any single day...."[2] The interpretation comports with Congress' aim of preventing laundering of drug money.

There is sufficient evidence from which a jury could find that Gomez–Osorio violated section 5324(3). "We review the record as a whole, in the light most favorable to the government, when evaluating this claim. Our inquiry is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Adler*, 879 F.2d 491, 495 (9th Cir.1988) (citation omitted) (emphasis supplied) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979)). Although the amount of a single money order is generally limited to $1000, Los Angeles banks place no restrictions on the number of money orders that a customer may purchase at one time. Yet, instead of purchasing a single cashier's check, buying multiple money orders at the same bank, or wiring the desired amount of money to a bank in Colombia, Gomez–Osorio obtained cashier's checks and money orders for amounts less than $10,000 from a series of banks.

■ Gomez–Osorio's improper jury instructions and substantive due process claims similarly must fail. "[W]hether a jury instruction misstated elements of a statutory crime is a question of law and is reviewed de novo." *See United States v. Spillone*, 879 F.2d 514, 525 (9th Cir.1989), *cert. denied,* — U.S. —, 111 S.Ct. 210, 112 L.Ed.2d 170 (1990). The district court's jury instruction was not improper. Further, in *United States v. Hoyland*, 914 F.2d 1125, 1130 (9th Cir.1990), we held that Hoyland's claim that section 5324 is void for vagueness was "without merit." Without relying on applicable regulations, we concluded that "[t]he statute identifies precisely the acts and intent that will constitute crime." *Id.*

### b. *Knowledge element*

Gomez–Osorio argues that the government failed to prove beyond a reasonable doubt that he had knowledge of the reporting requirements of sections 5316(a)(1)(A) and 5313(a). We reject the argument.

■ A section 5316(a)(1)(A) conviction for failing to file a transportation report requires a "willful failure to file a report." *United States v. Chen*, 605 F.2d 433, 434 (9th Cir.1979).[3] Gomez–Osorio's knowledge of section 5316's reporting requirements is supported by his six previous en-

---

**2.** 31 C.F.R. § 103.11(p) provides:

*Structure (structuring).* For the purposes of section 103.53 ["Structured transactions"], a person structures a transaction if that person, acting alone, or in conjunction with, or on behalf of, other persons, conducts or attempts to conduct one or more transactions in currency, in any amount, at one or more financial institutions, on one or more days, in any manner, for the purpose of evading the reporting requirements under section 103.22 of this part. "In any manner" includes, but is not limited to, the breaking down of a single sum of currency exceeding $10,000 into smaller sums, including sums at or below $10,000, or the conduct of a transaction, or series of currency transactions, including transactions at or below $10,000. The transaction or transactions need not exceed the $10,000 reporting threshold at any single financial institution on any single day in order to constitute structuring within the meaning of this definition.

**3.** Section 5316(a) provides:

tries into the United States and Czyrklis' testimony regarding the warning posters in all international airports. The government also introduced a transportation report that Gomez–Osorio had completed and signed when he entered the United States on February 8, 1987. In part one of the report, Gomez–Osorio declared that he was carrying more than $10,000 in cashier's checks. He had crossed out part two of the report, which was "for shipping, mailing or receiving currency or monetary instruments." The evidence, viewed in the light most favorable to the government, is sufficient to support a finding that Gomez–Osorio had knowledge of the reporting requirements. *See United States v. Alzate–Restreppo*, 890 F.2d 1061, 1064 (9th Cir.1989) (knowledge supported by posted notices, announcements, and signed customs declaration); *United States v. Rodriguez*, 592 F.2d 553, 557 (9th Cir.1979) (knowledge supported by signed customs declaration).

There also is sufficient evidence that Gomez–Osorio had knowledge of section 5313(a)'s reporting requirements. His actions made no sense unless he had knowledge of the banks' reporting requirements. He received $165,000 in currency from "a friend." Instead of purchasing a single cashier's check, buying multiple money orders at the same bank, or wiring the desired amount of money to a bank in Colombia, Gomez–Osorio utilized four runners to purchase a series of cashier's checks and money orders at several different financial institutions. Contrary to Gomez–Osorio's assertion, the government did more than merely prove the "transactions themselves."

## 2. *Expert testimony*

### a. *Money laundering*

■ Gomez–Osorio argues that the district court erred in admitting Special Agent

Except as provided in subsection (c) of this section, a person ... shall file a report under subsection (b) of this section when the person ... knowingly—

    (1) transports, is about to transport, or has transported, monetary instruments of more than $10,000 at one time—

      (A) from a place in the United States to or through a place outside the United States

Wood's expert testimony regarding money laundering. We review for an abuse of discretion. *See United States v. Kinsey*, 843 F.2d 383, 387–89, (9th Cir.), *cert. denied*, 488 U.S. 836, 109 S.Ct. 99, 102 L.Ed.2d 75 (1988).

Wood's testimony was properly admitted under Fed.R.Evid. 404(b) (other crimes, wrongs, or acts).[4] In *United States v. Conners*, 825 F.2d 1384 (9th Cir.1987), the defendants were convicted for failing to file a transportation report. We held that evidence of one defendant's cocaine involvement was admissible under Rule 404(b) "to prove [the defendant's] state of mind, that is, that he had a motive to conceal the currency ... and to fail to report its transportation into the United States." *Id.* at 1391.

Gomez–Osorio would distinguish *Conners* because there is no evidence that he was a money launderer. This contention, standing alone, does not indicate that the district court erred. The test for admission of evidence of motive is set forth in *Conners:* "The government must carry the burden of showing how the proffered evidence is relevant to one or more issues in the case, and must demonstrate that, on balance, its probative value is not substantially outweighed by the danger of unfair prejudice to the defendant." 825 F.2d at 1390. As in *Conners*, the district court: (1) conducted an extensive examination of the relevance of the evidence outside the presence of the jury; (2) excluded some of the evidence, *e.g.*, testimony regarding drug sources for illicit funds; and (3) gave an appropriate limiting instruction. Wood testified that the following evidence indicated that Gomez–Osorio was involved in money laundering: (1) ledger sheets re-

    ....

4. Rule 404(b) provides:

    Evidence of other crimes, wrongs, or acts is not admissible to prove the character of the person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent....

flecting large quantities of currency exchanged for monetary instruments; (2) the use of runners to obtain these instruments; and (3) the use of pagers. We find no abuse of discretion.

#### b. *Mental state*

■ Gomez–Osorio argues that Wood's testimony regarding Gomez–Osorio's criminal intent violated Fed.R.Evid. 704(b) (expert opinion on ultimate issue).[5] Wood testified that Gomez–Osorio "did in fact structure all these transactions in order to evade the requirement for filing the particular form." Because Gomez–Osorio did not raise a contemporaneous objection to Wood's testimony, the district court's decision to admit this testimony is reviewed for plain error. *See* Fed.R.Evid. 103(d); Fed. R.Crim.P. 52(b); *United States v. Hernandez*, 876 F.2d 774, 777 (9th Cir.), *cert. denied*, 493 U.S. 863, 110 S.Ct. 179, 107 L.Ed.2d 135 (1989).

In *Kinsey*, we held that "Rule 704 ... precludes an expert witness from testifying as to whether the defendant in a criminal case did or did not have the mental state where the mental state of the defendant constitutes an element of the crime with which the defendant is charged." 843 F.2d at 388 (footnote omitted). We also held that "[a]n ultimate issue opinion by a properly qualified expert should not be excluded except in the extreme case where the expert's opinion is inherently misleading or unfairly prejudicial." *Id.* at 389. In doing so, "we distinguished opinions regarding a defendant's guilt or innocence from expert testimony regarding the various roles which an individual may play in illegal enterprises." *Id.* at 388. *See also United States v. Lockett*, 919 F.2d 585, 590 (9th Cir.1990) (discussing *Kinsey*).

The district court erred, but its error was not plain error. Wood's testimony instructed the jury that section 5324(3)'s intent element was satisfied and, by implication, that Gomez–Osorio had violated section 5324(3). But: (1) the primary thrust of Wood's testimony explained Gomez–Osorio's role in a money laundering operation; (2) the government did not refer to Wood's testimony regarding Gomez–Osorio's mental state in its closing arguments and suggested that the jury use Wood's testimony only as evidence of *motive*; and (3) the remainder of the evidence against Gomez–Osorio sufficiently supports his conviction. A new trial is not necessary "to prevent a miscarriage of justice or to preserve the integrity of the judicial process." *United States v. Bustillo*, 789 F.2d 1364, 1367 (9th Cir.1986) (discussing plain error doctrine).

#### 3. *Mistaken belief jury instruction*

■ Gomez–Osorio argues that the district court erred in refusing to instruct the jury on his defense theory. It is frequently argued that there is an apparent conflict in our circuit's case law regarding the standard of review that should be applied to a district court's denial of a proposed jury instruction. *See United States v. Whitehead*, 896 F.2d 432, 434 (9th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 342, 112 L.Ed.2d 306 (1990). In general, "[a] defendant is entitled to have the judge instruct the jury on his theory of defense, provided that it is supported by law and has some foundation in the evidence." *United States v. Mason*, 902 F.2d 1434, 1438 (9th Cir.1990). Logically, if the parties dispute whether the required factual foundation exists, the court should apply an abuse of discretion standard of review. In this case, the ultimate issue is whether "other instructions, in their entirety, adequately cover that defense theory." *Id.* This is a question of law and, as in *Mason*, should be reviewed *de novo*. *See id.* There is no conflict; the question turns on the issue for review.

Even under the less deferential standard of review, the district court did not err in refusing Gomez–Osorio's proposed jury in-

---

**5.** Rule 704(b) provides:

No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

struction. The instruction provided that a person is not guilty of a violation of section 5316 if "he knew that Customs reporting requirements existed, but he mistakenly believed, in good faith, that the reporting requirements did not apply to the act of mailing cashiers checks or money orders...." The district court instructed the jury on all elements of a section 5316 violation, including: (1) "[t]he defendant had knowledge of the requirement to report such transportation" and (2) "the defendant willfully failed to report the transportation." These instructions adequately cover Gomez–Osorio's defense theory.

### 4. *Border search*

Gomez–Osorio argues that the district court erred in denying his motion to suppress evidence that was obtained by Ariza without a search warrant.

The district court did not err. In *United States v. Alfonso*, 759 F.2d 728, 739 (9th Cir.1985), we held that "[i]t is sufficient that the search be executed under the authority and direction of those agencies having jurisdiction in safeguarding the borders." Czyrklis was authorized to conduct the border search by 31 U.S.C. § 5317(b)[6] and directed Ariza to search Gomez–Osorio's package. As in *Alfonso*, "the search ... was part of a collaborative effort under the aegis of and in cooperation with Customs agents." *Id.* at 735.

### 5. *Sentencing*

Finally, Gomez–Osorio argues that the district court improperly increased his offense level by five points pursuant to U.S.S.G. § 2S1.3(b)(1).[7] He contends that there were no facts to support a finding that he "knew or believed the money was criminally derived." U.S.S.G. § 2S1.3(b)(1). The district court's factual findings in the sentencing phase are reviewed for clear

error. *See United States v. Burns*, 894 F.2d 334, 336 (9th Cir.1990).

There was evidence in the record that Gomez–Osorio was involved in money laundering: (1) ledger sheets reflecting large quantities of currency exchanged for monetary instruments; (2) the use of runners to obtain these instruments; and (3) the manner in which Gomez–Osorio used pagers. Law enforcement officers also seized from Gomez–Osorio's hotel room a counterfeit currency detector and a coded ledger. Gomez–Osorio cites *United States v. Safirstein*, 827 F.2d 1380, 1386 (9th Cir.1987), but, unlike *Safirstein*, the record does not support an inference that the funds were derived legitimately "as readily as" it supports an inference that the funds were criminally derived.

AFFIRMED.

---

6. Section 5317(b) provides:
   For purposes of ensuring compliance with the requirements of section 5316, a customs officer may stop and search, at the border and without a search warrant ... any envelope or other container ... entering or departing from the United States.

7. U.S.S.G. § 2S1.3(b)(1) (1984) provided:
   If the defendant knew or believed that the funds were criminally derived, increase by 5 levels.