UNITED STATES of America, Plaintiff–Appellee,

v.

Leanne DEES, Defendant–Appellant.

No. 93–50282.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 10, 1994.

Decided Sept. 1, 1994.

Jerry L. Newton, Newton and Newton, Hermosa Beach, CA, for defendant-appellant.

Alka Sagar, Asst. U.S. Atty., Los Angeles, CA, for plaintiff-appellee.

Before: WALLACE, Chief Judge, and FARRIS and KLEINFELD, Circuit Judges.

FARRIS, Circuit Judge:

Leanne Dees appeals her jury conviction for mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. We have jurisdiction over defendant's timely appeal pursuant to 28 U.S.C. § 1291. We affirm.

## I.

On January 13, 1989, Dees responded to an advertisement in a local Arkansas newspaper placed by Carolyn Burtch, a California resident hoping to privately adopt a child. Dees identified herself as Karen New. Dees made an arrangement with the Burtches pursuant to which she would receive $400 per month for living expenses during her pregnancy. In return, Dees agreed to place her baby for adoption with the Burtches.

Between February and May of 1989, the Burtches regularly contacted Dees and provided her with the requisite living expenses. The Burtches testified that they had no doubt that they would be adopting Dees's baby. Dees often referred to the baby she carried as "Carolyn's baby."

Nevertheless, in late March 1989, an attorney in Arkansas, Jerry Lovelace, was contacted by attorney Danny Stidham. Stidham identified himself as the representative of Leanne Dees and her husband Frank. Stidham said his clients were eager to place their unborn child up for adoption and desired Lovelace's assistance. On April 21, 1989, Stidham informed Lovelace that his clients had not eaten in the last two days and therefore needed an arrangement signed as soon as possible. On May 8, 1989, the Dees signed an "intent to adopt agreement" pursuant to which Lovelace's clients would pay $400 per month in living expenses for Dees and Dees would place her unborn child for adoption with Lovelace's clients.

On May 14, 1989, Dees telephoned Burtch to wish her a Happy Mother's Day. She did not indicate that her plans to place the unborn baby for adoption with the Burtches had changed. Dees also did not mention her arrangement with Lovelace's clients. This conversation was charged as count ten of the indictment (for which she was convicted). It was around this time that Carolyn Burtch began to discuss the possibility of adopting a second child at the same time as Dees's child. Dees apparently did not voice any protests to this proposal at that time.

On May 29, 1989, Dees called Burtch and told her that she and her husband wished to move to Nevada in order to be closer to the Burtches. Dees told Burtch that she needed money and, the next day, Burtch wired $200 to Arkansas. This wire transfer of funds was charged as count six of the indictment (for which she was convicted). On May 31, 1989, Jerry Lovelace gave Dees a check in the amount of $400 for living expenses for the month of June. Lovelace never had any further contact with Dees, Dees's husband, or Stidham, Dees's attorney.

During the first week of June, Dees called Carolyn Burtch and told her she was en route to Las Vegas. Burtch wired additional funds to the Dees. On June 21, 1989, Dees informed Burtch that she was in need of additional funds. Burtch wired $100 to Dees. Burtch was not contacted by Dees again.

Lovelace attempted to contact Dees and found a discarded box outside of her vacant

apartment. Included in the box was Carolyn Burtch's telephone number. Lovelace contacted Burtch in California.

In August, 1989, Burtch discovered that Dees, whom she had known as "Karen New," was staying at the Heritage Hotel in Sherman Oaks, California. Burtch visited Dees and Dees told Burtch that she had been under the impression that the Burtches had lost interest in her baby because they had not sent her additional funds. Dees told Burtch that another couple would be adopting her baby. This was the first time that Dees informed Burtch that she had changed her mind. The baby was born on September 11, 1989 with Down's Syndrome. The baby was not adopted by either couple.

On June 2, 1990, Dees telephoned Debbie Freeman, a resident of Los Angeles, California and told her that she was living in Las Vegas and was five months pregnant. The call was in response to an advertisement placed in an Arkansas newspaper. Dees told Freeman that she was interested in having the baby in Los Angeles with the same doctor who had delivered her previous baby. The next day, Dees phoned Freeman and told her that she was destitute, homeless and hungry. Freeman wired funds to Dees in order to pay the hotel bill in Las Vegas and provide her with sufficient funds to travel with her child to Los Angeles and eat. This wire transfer was charged as count seven of the indictment (for which Dees was convicted).

Freeman and her lawyer, Randi Barrow, accompanied Dees on a trip to the doctor who revealed that Dees was actually only three months pregnant (not five). Afterward, Dees and Freeman signed agreements which provided that Dees intended to place her unborn child for adoption and that, in return, Freeman would pay rent for the Dees's as well as cover all medical expenses. In addition, Freeman would provide Dees $125 per week until August 1990, at which point Dees would cover half of her expenses.

Between July and November 1, 1990, Freeman's attorney mailed checks for the rent while Freeman herself accompanied Dees in her visits to the doctor. Barrow's November 1, 1990 mailing was the basis for count five of the indictment (for which Dees was convicted). Freeman also provided Dees with living expenses, as was previously arranged. However after August, 1990 when it became apparent that the Dees's would not be able to pay their share of the expenses, Freeman voluntarily paid for all of the Dees's expenses.

As of June, 1990, Dees began to have some doubts about her relationship with Freeman although she never voiced those doubts to Freeman or Barrow. Dees was particularly upset because she was not permitted to meet Freeman's boyfriend. Moreover, Freeman requested that Dees undergo an amniocentesis, which Dees feared. At one point, Dees panicked about the test and Freeman suggested she take a valium. The comment was dismissed by Barrow as a "joke."

On October 9 and 10, 1990, Dees telephoned Joanne Pilla in New York from public phones located in Van Nuys, California. Dees identified herself as Leanne Baker and told Pilla that she was interested in placing her unborn baby for adoption. On October 13 and 14, Dees contacted Pilla from Las Vegas and informed her that she was interested in adoption but that she was homeless and hungry. On October 14, Pilla wired Dees $200 for food and shelter. The October 10, 1990 call was the basis of charge 13 of the indictment (for which Dees was convicted). The October 14, wire transfer was the basis for count 8 of the indictment (for which Dees was convicted).

On November 5, 1990, Barrow was contacted by another adoption attorney whose clients had met with Dees in the hopes of adopting her unborn child. When Barrow confronted Dees with this information, Dees stated that she was unhappy with Freeman and hung up. Two hours later, Barrow and Freeman found that the apartment they had rented for the Dees had been abruptly abandoned. They found in the apartment information which established that Dees owned a car and had received almost $3,000 from the Social Security Administration. Freeman had no further contact with Dees who eventually gave birth to a child that was adopted by a relative of Dees's husband.

At trial, Dees claimed that she had made numerous arrangements for the adoption of her babies because of her ambivalence with respect to the persons who had agreed to adopt. Dees claimed she was seeking to "cover her bases."

On November 19, 1992, a federal grand jury indicted Leanne Dees on five counts of mail fraud and ten counts of wire fraud. The jury found Dees guilty of one count of mail fraud and five counts of wire fraud. The jury acquitted Dees of two counts of mail fraud and deadlocked on two counts of mail fraud and four counts of wire fraud. The court declared a mistrial on the deadlocked counts and the government moved to dismiss those counts. Prior to the commencement of deliberations, the government moved to dismiss one count of wire fraud.

On April 5, 1993, Dees was sentenced to thirty months in custody on counts five, six, seven, eight, ten and thirteen (to be served concurrently) followed by a three year term of supervised release.

## II.

Dees argues the jury should have been instructed that under California law it is illegal to enter into a contract for the adoption of an unborn child, and payments made to pregnant women in anticipation of a subsequent adoption are considered charitable donations with no binding consequences. The issue is whether the court's instruction on specific intent to defraud rendered Dees's proposed good faith instructions superfluous. This question of law is reviewed de novo. *United States v. Gomez–Osorio*, 957 F.2d 636, 642 (9th Cir.1992).

In general, "[a] defendant is entitled to have the judge instruct the jury on his theory of defense, provided that it is supported by law and has some foundation in the evidence." *United States v. Mason*, 902 F.2d 1434, 1438 (9th Cir.1990); *United States v. Lopez*, 885 F.2d 1428, 1434 (9th Cir.1989), *cert. denied*, 493 U.S. 1032, 110 S.Ct. 748, 107 L.Ed.2d 765 (1990). It is not reversible error to reject a defendant's proposed instruction on his theory of the case if other instructions, in their entirety, adequately cover that defense theory. *Mason*, 902 F.2d at 1438.

Dees argues that her proposed instructions should have been read to the jury as part of her good faith defense. Good faith is always a defense to fraud. *See, e.g., United States v. Gering*, 716 F.2d 615, 622 (9th Cir.1983); *United States v. Dunn*, 961 F.2d 648, 650 (7th Cir.1992). However, a specific good faith instruction is unnecessary where the court has already adequately instructed the jury as to specific intent. *United States v. Lorenzo*, 995 F.2d 1448, 1455 (9th Cir.), *cert. denied*, — U.S. ——, 114 S.Ct. 225, 126 L.Ed.2d 180 (1993); *United States v. Rushton*, 963 F.2d 272, 274 (9th Cir.1992); *United States v. Bonanno*, 852 F.2d 434, 440 (9th Cir.1988) *cert. denied*, 488 U.S. 1016, 109 S.Ct. 812, 102 L.Ed.2d 801 (1989). *See also Gomez–Osorio*, 957 F.2d at 642.

Dees does not challenge the adequacy of the district court's instruction on intent to defraud.[1] The instruction given more than adequately reflects the definition of intent to defraud, as Congress intended it, under 18 U.S.C. §§ 1341 and 1343. The district court's instruction on intent to defraud obviated the need for Dees's instruction as to her

---

1. The court instructed the jury that:

   To act with intent to defraud means to act willfully and with specific intent to deceive or cheat, ordinarily for the purpose of either causing some financial loss to another, or bringing about some financial gain to oneself. However, the evidence in the case need not establish that the United States or any person, was actually defrauded, but only that the defendant acted with the intent to defraud.

   An intent to defraud may be demonstrated by the scheme itself. Similarly, the defendant's knowledge of a false statement or her reckless indifference to the truth or falsity can demonstrate an intent to defraud.

   If you find that the evidence has established that the defendant profited or converted money to her own use, or if you find that an economic injury has been inflicted on some person, you may consider this evidence in determining whether the defendant acted with the required intent to defraud.

right to change her mind in good faith under California law.

## III.

■ Dees argues that the court erred in instructing the jury that verbal agreements are binding. An erroneous jury instruction is grounds for reversal if "there is a reasonable possibility that the error materially affected the verdict." *United States v. Rubio–Villareal,* 967 F.2d 294, 296 n. 3 (9th Cir. 1992) (en banc) (*quoting United States v. Valle–Valdez,* 554 F.2d 911, 915 (9th Cir. 1977)); *United States v. Kindred,* 931 F.2d 609, 611 (9th Cir.1991).

During the jury's deliberations, the jury requested clarification on the five elements of mail fraud. The jury also passed a note to the judge asking whether verbal agreements are binding. The following colloquy took place:

COURT: Did someone send—is this from you: Is a verbal agreement binding?

JURY: Yes

COURT: Does it become binding when money passes between the two parties?

JURY: Yes

COURT: A verbal agreement is binding and—depending upon the situation. It has a lot of legal consequences. But the question is: Is a verbal agreement a binding agreement? Yes. Does it become binding when money passes between the two parties? Again, I think that this may be a little bit of confusion. The law of adoption is not involved in this case. This is a case which claims— in which the government claims it was fraud. And the question is not whether or not there was a binding agreement, but whether or not there were, as indicated in the elements, false promises or statements made by the defendant, the defendant knew that the promises or statements were false or fraudulent, that the statements were of a kind that would reasonably influence a person to part with money or property, defendant acted with the intent to defraud under those circumstances, and that the defendant used or caused to be used the mails to carry out, or attempt to carry out the scheme. This does not involve the ques-

tion of a breach of contract. This is not a breach of contract case.

R.T. 512–13.

■ The binding nature of verbal agreements was an issue irrelevant to mail and wire fraud. The request for clarification highlights the confusion in the jury's mind between broken promises and false promises. The district court followed its response to the jury's question with an explanation of the law of mail and wire fraud. The court emphasized that contract law analysis had no place in the jury's deliberations. It made clear that the only issue for the jury was whether Dees was guilty of mail and wire fraud. Although the district court's clarification on the binding nature of verbal agreements was unnecessary, it had no effect on the jury's verdict. It was not error.

## IV.

Dees argues that her constitutional right of confrontation was violated as a result of the district court's decision to limit cross-examination of the victim witnesses.

■ The trial court has discretion to impose reasonable limits on cross-examination, and we find error only when that discretion has been abused. *United States v. Vargas,* 933 F.2d 701, 704 (9th Cir.1991); *United States v. Jackson,* 882 F.2d 1444, 1446 (9th Cir.1989). Whether limitations on cross-examination are so severe as to amount to a violation of the confrontation clause is a question of law reviewed de novo. *United States v. Jones,* 982 F.2d 380, 383 (9th Cir. 1992); *United States v. Jenkins,* 884 F.2d 433, 435 (9th Cir.), *cert. denied,* 493 U.S. 1005, 110 S.Ct. 568, 107 L.Ed.2d 562 (1989).

The district court ruled that inquiries into the state of mind of the victim witnesses with regard to whether they understood that Dees retained the right to change her mind as to the adoptions were irrelevant. Dees protests this ruling as legally incorrect, unfair and prejudicial. She notes that on direct examination, the Government was permitted to discuss with the victim witnesses what their understanding was with regard to the defendant's representations. At the very least, argues Dees, this opened the door for her to

discuss whether the victim witnesses understood that Dees retained the right to change her mind at any time.

■ Dees's argument is meritless. Whether the victim witnesses knew that in the future, Dees retained the legal right to change her mind, has no bearing on any of the elements of mail or wire fraud. The district court's decision to disallow inquiries as to the victim-witness' understanding of adoption law at the time they entered into their agreements was not error, whatever the legal standard applied.

## V.

The district court ruled that Dees could not cross examine victim witness Burtch as to whether she wished to see Dees convicted and victim witness Freeman as to whether she had negotiated a contract for the rights to the story of her experiences with Dees. Dees argues these rulings unfairly restricted cross-examination into the bias and motive of said witnesses.

■ With respect to Burtch, Dees was permitted to ask whether Burtch harbored bad feelings toward the defendant and whether she had written a letter to the police asking them to "get her." The single question Dees was not permitted to ask was whether Burtch "want[ed] to see [Dees] convicted of a crime." In light of the substantial information Dees was permitted to elicit from Burtch relating to her biases, the district court was within the boundaries of its discretion. *United States v. Brown*, 936 F.2d 1042, 1049 (9th Cir.1991).

With respect to Freeman, Dees was permitted to ask her whether she had a financial interest in the case. Dees was not permitted to ask whether Freeman had a financial interest in the outcome of the case. In addition, Dees was not permitted to ask Freeman whether she had sold the rights to the story of her experiences with Dees to a motion picture company. The district court found evidence related to Freeman's movie contract irrelevant and outweighed by prejudicial effect.

The government argues that evidence of the movie contract had no bearing on Freeman's veracity as a witness. It is true that there was no evidence that the movie contract was in any way contingent on the outcome of the trial. Nevertheless, it seems likely that it was. The market value of a story that ends in acquittal is unlikely to be the same as the market value of a story that ends in conviction. If Freeman was swindled, then there is grist for the cinematic mill; if she was just disappointed, then there is pathos but no movie. The absence of a record relating to Freeman's movie contract is based on the fact that the district court closed the door on that line of inquiry, and refused to allow an offer of proof.

■ If Freeman stood to gain more from a conviction than an acquittal, then the movie contract was relevant as to bias. The movie contract might have affected Freeman's testimony both because of the pecuniary benefit to her of a guilty verdict, and because of the nonpecuniary benefit to her of a favorable portrayal in the movie. The district court also found, however, that whatever value the evidence had was outweighed by the prejudice likely to result from its revelation before the jury. The district court abused its discretion in so ruling. Information regarding the movie contract was only prejudicial in so much as it revealed a potential reason for Freeman to distort the truth relating to her experiences with Dees. This would not be "unfair prejudice" for purposes of Federal Rule of Evidence 403.

The same is true of the district court's conclusion that Dees could not ask Freeman if she had a financial interest in the outcome of the trial. This question was critical to the jury's determination of Freeman's credibility as a witness. The district court abused its discretion in denying Dees the opportunity to inquire as to Freeman's financial interest in the trial outcome.

■ The question is whether the district court's errors were harmless beyond a reasonable doubt. *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). *Van Arsdall* holds that where Confrontation Clause violations are found, harmless error analysis focussing on the *entire trial* is applied. *See Van Arsdall*,

475 U.S. at 684, 106 S.Ct. at 1438. The focus is on:

> the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.*

 Dees was convicted on two counts that directly related to the testimony of Debbie Freeman. The first count (count 7) related to a wire transfer that Freeman made on June 2, 1990 in response to a call made by Dees stating that she was destitute, homeless, hungry, and five months pregnant. In addition to Freeman's testimony relating to the wire transfer, the jury learned that on May 24, 1990, Dees received a check from the Dunsworth family in Arkansas for $500 for living expenses in connection with the adoption of the same baby she discussed with Freeman. At the time that Dees contacted Freeman, she had not informed the Dunsworths that she no longer planned to let them adopt her baby. In addition, the fact that Dees told Freeman that she was five months pregnant (when in fact she was only three months pregnant) must have struck a chord with the jury which recognized this pattern from Dees's involvement with the Burtches.

The second count (count 5) related to a check Freeman's attorney mailed to Dees on November 1, 1990 for the rent of Dees's apartment in California. Sixteen days earlier, Dees had received $200 from Joanne Pilla in New York City whom she had contacted under the pseudonym "Leanne Baker." Dees never informed Pilla that the deal was off but simply left a message thanking her for the money. Dees was convicted on two counts for her dealings with Pilla.

None of the facts established by Freeman's testimony could have been affected by impeaching her credibility because on each count of conviction, unimpeached evidence demonstrated that Dees had sold the same baby to different people at the same time. Viewing the entire record, we are satisfied that the evidence of Dees's guilt was overwhelming. We are satisfied that conviction was not buttressed by the error. *United States v. Alvarado,* 838 F.2d 311, 317 (9th Cir.1988), *cert. denied,* 488 U.S. 838, 109 S.Ct. 103, 102 L.Ed.2d 78 (1988). The district court's error is harmless beyond a reasonable doubt.

AFFIRMED.