62 F.3d 1426
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Richard Chester FABINIAK, Defendant-Appellant.
 No. 94-50299.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 6, 1995.
Decided Aug. 2, 1995.
 
 1
 Before: BROWNING and BEEZER, Circuit Judges and HAGGERTY, District Judge.[1]
 
 MEMORANDUM[2]
 
 2
 Defendant appeals from a jury conviction for conspiracy, six counts of mail fraud, and three counts of interstate transportation of property obtained by fraud. Defendant contends on appeal that the district court impermissibly enlarged the scope of his indictment when it gave to the jury a pattern instruction on fraud that included immaterial language pertaining to "intangible rights." Defendant also asserts that the district court erred by refusing to give a multiple conspiracy instruction, and alternatively, that these predicate errors render the conspiracy instruction given by the court improper. We affirm.
 
 I.
 
 3
 Defendant Richard Chester Fabiniak and co-defendant Lawrence Evan Wolcott worked together as stockbrokers in Buffalo, New York in the early 1970's. In 1985 and 1986, defendant served as treasurer and director of "Hybrilonics," a manufacturer of microcircuits in Niagara Falls, NY. Defendant was ousted from Hybrilonics after a shareholders' dispute, and in early 1987 began planning with Wolcott to start a new microcircuitry business called Niagara Scientific, Inc., ("NSI").
 
 
 4
 From 1987 through 1989, Wolcott and defendant collected hundreds of thousands of dollars from investors, but failed to take steps to launch NSI. Instead, the two used the investors' money for personal expenses, gambling, and speculative options trading.
 
 
 5
 While defendant incorporated NSI and established bank accounts in its name, Wolcott solicited investments from the client base he had developed as a stockbroker. Wolcott promoted both Hybrilonics and NSI as secure investments. Defendant and Wolcott obtained over $350,000 from approximately 15 investors between July 1987 and January 1989.
 
 
 6
 Neither defendant nor Wolcott undertook any business with the solicited investments, and the investment funds were squandered. When investors made inquiries, they were sent letters of explanation from Fabiniak, worthless Hybrilonics stock certificates, and/or checks that were returned due to insufficient funds.
 
 
 7
 Fabiniak and Wolcott were charged by an eleven-count indictment with conspiracy (Count 1), mail fraud (Counts 2-7), and interstate transportation of property obtained by fraud (Counts 8-11), in violation of 18 U.S.C. Secs. 371, 1341 and 2341, respectively. Co-defendant Wolcott negotiated a plea and testified at Fabiniak's trial. Fabiniak was found guilty of Counts 1-10 by a jury on March 4, 1994 (Count 11 was dismissed before trial), and was sentenced to 24 months.
 
 
 8
 During final instructions, the district court read the indictment and reviewed 18 U.S.C. Sec. 1341, the mail fraud statute that defendant was charged with violating. Section 1341 refers to persons who devise or intend to devise "any scheme or artifice to defraud or for obtaining money by means of false or fraudulent pretenses." The jury was instructed that the phrase "any scheme or artifice to defraud" meant "any deliberate plan of action or course of conduct by which someone intends to deceive or to cheat another, or by which someone intends to deprive another of something of value." The district court went on to instruct, however, that:
 
 
 9
 "A scheme or artifice to defraud" includes a scheme to deprive another person of tangible as well as intangible property rights. Intangible property rights means anything valued or considered to be a source of wealth including, for example, the right to honest services and the right to decide how one's money is spent.
 
 
 10
 The government acknowledges that the "intangible property rights" language was inapplicable in this case. The government contends, however, that its inclusion was immaterial because the evidence introduced at trial did not permit a conviction under the "intangible rights" theory and there is no reasonable likelihood that the verdict was affected by those instructions. The defendant argues that the "intangible rights" instruction improperly enlarged the scope of the indictment, and was improper under McNally v. United States, 483 U.S. 350 (1987), (superseded by statute as stated in United States v. Thomas, 32 F.3d 418, 419 (9th Cir.1994)).
 
 II.
 
 11
 The de novo standard of review applies in determining whether a jury instruction misstates the elements of a statutory crime. United States v. Blinder, 10 F.3d 1468, 1477 (9th Cir.1993). Similarly, whether the instructions correctly explain the law and the elements of fraud is reviewed de novo. United States v. Dischner, 960 F.2d 870, 887 (9th Cir.), amended, reh'g denied, 974 F.2d 1502 (1992), cert. denied, --- U.S. ----, 113 S.Ct. 1290 (1993); United States v. Mundi, 892 F.2d 817, 818 (9th Cir.1989), cert. denied, 498 U.S. 1119 (1991). Nonconstitutional errors in jury instructions require reversal only when there is a reasonable possibility that the error materially affected the verdict. United States v. Dees, 34 F.3d 838, 843 (9th Cir.1994); United States v. Koshnevis, 979 F.2d 691, 696 (9th Cir.1992). "A single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." United States v. Marsh, 894 F.2d 1035, 1040 (9th Cir.1989), cert. denied, 493 U.S. 1083 (1990).
 
 III.
 
 12
 Fabiniak first contends that the "intangible property rights" language in the jury instructions constituted reversible error under McNally. In McNally, the Supreme Court eliminated the "intangible rights" theory of mail fraud prosecution, which often had been used against persons involved in political corruption who otherwise evaded federal prosecution. The Court held that the legislative intent of the then-applicable mail fraud statute was limited to protecting property rights. The Court concluded that the mail fraud statute was intended to protect property or monetary rights, but not the "intangible right of the citizenry to good government." McNally, 483 U.S. at 356. After McNally, the elements of mail fraud were interpreted to require that the fraudulent scheme was intended to obtain money or property from the party being deceived. See United States v. Lew, 875 F.2d 219, 221 (9th Cir.1989).
 
 
 13
 In November 1988, Congress nullified McNally by enacting 18 U.S.C. Sec. 1346, which provides that the protective scope of the statute includes schemes to deprive others of the intangible right of honest services. The indictment in this case, however, concerns allegations occurring before Sec. 1346 was enacted, and McNally applies. See Thomas, 32 F.3d at 119.
 
 
 14
 Under McNally, a deprivation of honest services and fair dealing did not constitute mail fraud. Instead, the defendant must have intended to deprive victims of money or property. Thomas, 32 F.3d at 419. This case is distinguishable from McNally. The indictment in this case makes no mention of an intangible rights theory, and no arguments as to that theory were asserted at trial. Rather, the indictment alleges--and substantial evidence was presented at trial demonstrating--that the investors' money was the object of the mail fraud conspiracy. In addition to the mistaken reference to intangible rights, the instructions given to the jury repeatedly charged that the jury was required to find that the objects of the conspiracy were money or property. The deprivation of intangible property rights was neither an articulated theory of prosecution nor a reasonably possible basis for the jury's verdict.
 
 IV.
 
 15
 Defendant also argues that the intangible property rights instruction, coupled with the co-conspirators' ("Pinkerton" ) instruction, improperly enlarged the scope of the indictment by permitting defendant's conviction for crimes committed by co-conspirators while he was a member of the conspiracy. Defendant contends that the jury could have concluded that co-defendant Wolcott deprived investors of intangible property rights (the "right to decide how one's money is spent"), and then could have convicted defendant under the Pinkerton instruction.
 
 
 16
 This argument raises the issue of whether there is a reasonable likelihood that the jury's verdict was affected by the inappropriate reference in the instructions to intangible property rights. Koshnevis, 979 F.2d at 696. A constructive amendment to the indictment occurs where the jury instructions so modify the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the grand jury's indictment. United States v. Lignarolo, 770 F.2d 971, 981 n. 15 (11th Cir.1985) (quotations omitted). Reviewing the instructions in their entirety and the evidence presented at trial, and considering that the indictment was read to the jury, we hold that there is no reasonable possibility that the single error materially affected the verdict.
 
 
 17
 The indictment alleges in Count One that defendant and Wolcott conspired to "obtain money and property by means of false, fraudulent and misleading representations" in violation of 18 U.S.C. Sec. 1341. The specific criminal allegations subsequently detailed in the indictment only concern solicitations for investment funds. In identifying the objects of the conspiracy, the indictment alleges that defendant and Wolcott engaged in a series of acts enabling them to "induce victim-investors to relinquish thousands of dollars to them for the ostensible purpose of investing in NSI and/or Hybrilonics," and to "transfer these monies to their personal use and benefit."
 
 
 18
 During final instructions, the jurors were repeatedly told that a guilty verdict required finding that defendant and Wolcott schemed to defraud their victims for the purposes of obtaining property and money. Jurors were instructed, for example, that the indictment alleged that the defendant and Wolcott "intended to devise and knowingly participated in a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses...." In describing the elements of the charged federal mail fraud statute, the district court indicated that the crime applied to persons "having devised or intending to devise any scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses...."
 
 
 19
 The district court went on to reiterate the financial objects of the conspiracy alleged against defendant. The jury was told that an "unsuccessful scheme or plan to defraud or scheme or plan to obtain money by means of false or fraudulent pretenses ... is as illegal as a scheme or plan that is ultimately successful." The district court then instructed twice that the burden of proof for conviction was that "the government must prove beyond a reasonable doubt ... that the use of the mails furthered ... the scheme or plan to defraud, or the plan to obtain money or property by means of false or fraudulent pretenses...." The jury was then told that "[e]ach use of the mails to advance or to further ... the scheme or plan to defraud, or the scheme or plan to obtain money or property by means of false or fraudulent pretenses ... may be a separate violation of the mail fraud statute."
 
 
 20
 In addition to these repeated references in the instructions and in the indictment to the conspiracy's object of "obtaining money or property," the evidence produced at trial involved schemes or fraudulent misrepresentations that only resulted in the acquisition of investors' money. There was no evidence presented or argument made regarding the possible deprivation of intangible property rights.
 
 
 21
 In short, the indictment charged that defendant conspired to obtain money through fraudulent means; the fraud evidence presented at trial pertained only to schemes to obtain investors' money and to misrepresent investors; and the jury was instructed repeatedly that the charged conspiracy's object was financial. There is no reasonable likelihood that the jury's verdict was affected by the court's reference in the instructions to a theory of criminal liability involving the deprivation of "intangible rights." See United States v. Perholtz, 836 F.2d 554 (D.C.Cir.) (per curiam) cert. denied 488 U.S. 821 (1988) (appellants' appeal of intangible rights mail fraud convictions after the McNally decision did not raise a substantial question likely to result in reversal). In Perholtz, the court held:
 
 
 22
 If particular sentences of the jury charge are read in isolation, it appears that the jury could have returned guilty verdicts on the ... mail fraud charges based on an intangible rights theory. But it is not our task to review only isolated parts of the charge. As the Supreme Court wrote in United States v. Park, 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1989): " '[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' "
 
 
 23
 * * *
 
 
 24
 * * *
 
 
 25
 The jury charge, read as a whole, together with the description of the scheme in the indictment, to which the supposedly prejudicial instruction refers, reveals that the jury could not have found the defendants guilty on an intangible rights theory.
 
 
 26
 Id. at 559 (citations omitted).
 
 
 27
 The same is true in this case. We hold that the erroneous reference to intangible property rights, when considered in light of the indictment, the evidence presented at trial and the jury instructions as a whole, fails to amount to reversible error.
 
 V.
 
 28
 Defendant requested instructions on the issue of whether multiple conspiracies existed in the case. The court refused to give such instructions, and defendant appeals on the basis of that rejection.
 
 
 29
 The issue of whether the evidence was sufficient to support the giving of a multiple conspiracies instruction is subject to de novo review. United States v. Anguiano, 873 F.2d 1314, 1317 (9th Cir.), cert. denied 493 U.S. 969 (1989). A defendant is entitled to a multiple conspiracies instruction only if the defendant's theory of multiple conspiracies is supported by law and has some foundation in the evidence presented at trial. Id. Even if the evidence would have supported a multiple conspiracies instruction, however, the failure to so instruct "is error only if the instructions as a whole, considered in the context of the entire trial, did not fairly and adequately cover the issues." Id.
 
 
 30
 Defendant asserts in his brief that the evidence at trial "established without any doubt that the government's main witness, co-defendant Wolcott, was doing his own separate scams, indeed separate conspiracies, as he was ripping people off and getting proceeds in the names of three different people...." Counsel goes on to conclude that "[b]ased on the evidence produced at trial, a jury could have found that multiple conspiracies had taken place, rather than the single conspiracy charged in the indictment."
 
 
 31
 The general test for identifying single conspiracies contemplates the existence of subagreements or subgroups. United States v. Shabani, 48 F.3d 401, 403 (9th Cir.1995). In determining whether there was an unlawful variance between an indictment for a single conspiracy and proof of multiple conspiracies, evidence is viewed in a light most favorable to the prosecution to see whether any rational juror could have found a single conspiracy beyond a reasonable doubt. Id.; United States v. Patterson, 819 F.2d 1495 (9th Cir.1987).
 
 
 32
 Defendant's argument blurs separate acts at separate times with separate conspiracies. As we have has warned, "[a]lmost any venture, criminal or legitimate, is analyzable into a series of bits, each of which, in turn, is characterizable as an independent plan or goal." United States v. Kearney, 560 F.2d 1358, 1362 (9th Cir.), cert. denied 434 U.S. 971 (1977). Defendant fails to establish that his theory of multiple conspiracies had adequate foundation in the evidence presented at trial to warrant the requested instruction. The district court's refusal to give such instructions was not error.
 
 VI.
 
 33
 Defendant's last contention is that the district court erred in instructing the jury under Pinkerton v. United States, 328 U.S. 640 (1946), that the defendant is liable for acts of co-conspirators even if the defendant is unaware of those acts, or even of the existence of the co-conspirators. A district court's formulation of jury instructions is reviewed for an abuse of discretion. United States v. Woodley, 9 F.3d 774, 780 (9th Cir.1993).
 
 
 34
 This argument is presented as being derivative of defendant's assertions regarding the impropriety of giving the intangible property instruction and refusing to give the multiple conspiracies instruction. Defendant argues that those predicate errors render the Pinkerton instruction reversible error, because the jury could have convicted on the basis that co-conspirator Wolcott was engaged in (1) depriving the investors of intangible property rights, and/or (2) other, separate conspiracies unrelated to defendant.
 
 
 35
 The district court did not commit an abuse of discretion. There was no reasonable likelihood that the jury could have convicted on an intangible rights theory, and a multiple conspiracies instruction was not warranted. Accordingly, the argument concerning the Pinkerton instruction is meritless.
 
 
 36
 AFFIRMED.
 
 
 
 [1]
 Honorable Ancer L. Haggerty, United States District Court for the District of Oregon, sitting by designation
 
 
 [2]
 This disposition is not appropriate for publication and may not be cited to or used by the courts of this circuit except as provided by Ninth Circuit Rule 36-3